NO. 3--97--0524

                                                                 

IN THE 

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 1998

LAKEHEAD PIPELINE COMPANY, ) Petition for Review LIMITED PARTNERSHIP  )  of an Order of the

    )  Illinois Commerce

Petitioner-Appellant,  ) Commission

  )

v.  )

    )

ILLINOIS COMMERCE COMMISSION,   ) No. 96--0145

ILLINOIS DEPARTMENT OF    )

AGRICULTURE, ILLINOIS DEPARTMENT)

OF TRANSPORTATION, ILLINOIS  )

ENVIRONMENTAL PROTECTION AGENCY )

MCHENRY COUNTY, KENDALL COUNTY, )

KANE COUNTY, VILLAGE OF MOKENA, ) 

CITY OF WOODSTOCK, CITY OF  )

PLANO, COMMUNITIES AGAINST  )

THE PIPELINE, ROBERT POLLACK.  )

  )

Respondents-Appellees.  )

                                                                   
 MODIFIED UPON DENIAL OF REHEARING

Justice BRESLIN delivered the opinion of the court:

                                                                  

This controversy concerns a challenge to the Illinois Commerce Commission's (Commission) authority to regulate a proposed interstate pipeline under the Common Carrier by Pipeline Law (Pipeline Law), (220 ILCS 5/15-100 
et
 
seq.
 (West 1996)).  Petitioner Lakehead Pipe Line Company (Lakehead) and 
amici
 
curiae
 assert that the Commission exceeded its lawful authority when reviewing Lakehead's application for a certificate in good standing under section 
15-401
 of the Pipeline Law, (220 ILCS 5/15-401
 (West 1996)).  Lakehead also claims that the Commission erroneously interpreted the "public need" requirement of 
15-401(b), resulting in an unlawful interference with interstate commerce and an arbitrary denial of Lakehead's application.  We hold that the Commission did not exceed its lawful authority and that its interpretation and application of the Pipeline Law is reasonable and does not conflict with the
 
commerce clause of the United State Constitution, (U.S. Const., art I, § 8 clause 3).  Thus, we affirm. 

I. FACTS

Lakehead is a limited partnership which owns the United States portion of the world's longest liquid petroleum pipeline.  With its Canadian affiliate, Interprovincial Pipe Line, Inc. (IPL), Lakehead transports crude petroleum and other liquid hydrocarbons along approximately 3,200 miles of pipeline across North America from the Northwest Territories and the Province of Alberta to refineries in the
 
Midwest as well as the Provinces of Ontario and Quebec.  Within Illinois, Lakehead operates a 116.64 mile stretch of pipe referred to as 
line
 6A.  Line 6A went into service in 1969.  It enters Illinois from Wisconsin near Harvard and follows a route through McHenry, Kane, Cook, DuPage and Will 
Counties.  It then proceeds to Indiana and enters that state near Griffith, Indiana.  Line 6A was generally constructed upon rights-of-way acquired from public utilities, as well as easements and fee interests purchased from private landowners.  It did not require the use of eminent domain. 

As part of a system expansion program, Lakehead began adding new pumping stations to 
line
 6A to meet a greater demand for crude petroleum along its system.  When Lakehead determined that 6A's practical capacity was reached, which it said resulted in rationing during peak periods, it decided to construct a new 24-inch pipeline that it refers to as 
line
 14.  Proposed 
line
 
14 will track through several Illinois counties, including DeKalb, Kane, and Kendall counties, and is to interconnect with 
line
 
6A in Mokena, Illinois.  The new line is part of a large expansion program named System Expansion Program II, which calls for greater transportation of crude oil by Lakehead and IPL to and through Illinois.  A new route was determined to be desirable due to the significant development in the counties along 
line
 6A since 1969, and the fact that proposed 
line
 14 would traverse predominantly rural and agricultural land.  Its total cost is estimated to be $300 Million.

Before beginning construction, Lakehead sought the issuance of a certificate in good standing under section 
15-401 of the Pipeline Law, which is a first step toward acquiring eminent domain authority.  During the application process, Lakehead made clear that it sought to negotiate with landowners and municipalities along the proposed route, but it noted that it may eventually need condemnation authority in order to achieve its goal.  Several counties, municipalities, and state agencies intervened, as did numerous landowners.  Landowners formed an organization titled Communities Against the Pipeline (CAP) in order to form an organized group of landowners in opposition to 
line
 14.

An extended hearing with numerous witnesses and exhibits was held before a Commission hearing examiner.  At the hearing, Lakehead presented evidence regarding the fact that it properly filed its application, and that it was fit, willing and able to construct the line and maintain it safely and effectively.  It also argued that there was a public need for the line and the route chosen was consistent with the public's need and convenience.  With respect to need, Lakehead's witnesses testified that there would be substantial growth in the demand for crude oil during the next decade.  There was testimony that the demand flowed from the increased demand for refined petroleum products.  Representatives from 
Midwest
 refineries that purchase crude oil from Lakehead stated that they needed increased supplies of Canadian crude oil in order to maintain competitive rates in the markets for refined petroleum products and that the capacity restraints had a negative economic impact on refiners. However, representatives acknowledged that their future demands for crude oil could be met with the current pipeline system established in the 
Midwest
 of which Lakehead controls 40% of the market.  Lakehead also offered testimony that the purchase of crude oil from its system could result in savings to refiners which could be passed on to consumers.  Mark Turri, an employee of Mobil Oil Corporation, said that Canadian crude oil would be cheaper and that an adequate supply of Canadian crude would ultimately benefit consumers.  Canadian oil consultant Timothy Partridge pointed out, however, that Canadian crude oil production capabilities would decline after 2002. 

William Gould, a senior economic analyst for the Commission,  testified that the interest of refiners, shippers, and producers should be viewed as business interests rather than public interests.  In his opinion, as long as the public had an adequate supply of refined petroleum products at reasonable prices, public convenience and necessity were being served.  Since there was no evidence that an adequate supply of refined products were not available at reasonable prices, Mr. Gould stated that there was no public need for 
line
 14.  He testified that Lakehead merely demonstrated a private interest in wanting to deliver more Canadian crude oil to refineries in the midwest.

Along the same line, there was the testimony of James McDonald, who was ruled not to be an expert but whose testimony could be accepted for its factual content, and Merton Miller, a Nobel Laureate in Economics.  Both stated that any barrel of oil that would be shipped via the proposed line would simply displace crude oil which arrives from other points on other lines.  This is the case because all of the 
Midwest
 refineries were operating at or near capacity and the supply of crude oil already significantly exceeded the capacity of the refineries.  According to Miller, a new line would only assist in giving Lakehead a greater market share.  It would not result in any benefit to the public because the aggregate supply would not change and thus the price of crude oil would not be affected.  Any benefit from the new line would flow entirely to Lakehead and Canadian oil producers. 

At the close of the hearing, the examiner concluded that the need and demand for more capacity on Lakehead's system were the relevant considerations for certification under section 
15-401 and that such need and demand were clearly established.  Thus, having determined that the statutory prerequisites of section 
15-401 had been met, the examiner recommended that the application be granted.

The Commission rejected the examiner's recommendation.  It determined that Lakehead failed to demonstrate a public need for the new line.  In doing so, the Commission stated that it agreed with the analysis proposed by its staff that public need must be assessed by looking to the demand for refined petroleum products and not only crude oil 
per
 
se
.   Public need, according to the Commission, must be determined not by looking to the needs of any individual or number of individuals, but by looking to the public at large since "[t]he public *** is greater than a limited number of market players."  The Commission concluded that Lakehead failed to support its claim that
 
line
 14 would have a positive price effect on the market for refined products and that since the consuming public did not lack an adequate supply of refined petroleum products at adequate rates, and there was no shortage or crisis, no public need for Line 14 existed.  Lakehead's application was therefore denied and it appeals.  On appeal, Lakehead is supported by 
amici
 briefs from numerous oil and pipeline companies and associations.

II. DISCUSSION

A. Scope of Commission Authority

On appeal from the Commission, this court's review is limited to considering whether: (1) the Commission acted within its authority; (2) state or federal constitutional rights have been infringed; (3) the decision is supported by substantial evidence; (4) adequate findings were made to support the decision . 
Citizens United For Responsible Energy Development, Inc. v. Illinois Commerce Comm'n
, 285 Ill. App. 3d 82, 673 N.E.2d 1159 (1996).  The burden of proof on all issues raised on appeal rests with the appellant. 220 ILCS 5/10-201(d) (West 1996); 
United Cities Gas Co. v. Illinois Commerce Comm'n
, 163 Ill. 2d 1, 643 N.E.2d 719 (1994). 

The first issue we will address is whether the Commission exceeded its lawful authority.  More specifically, the first issue is whether the Commission exceeded its authority by interpreting section 
15-401(b) of the Pipeline Law as requiring it to determine whether Lakehead, a pipeline carrier operating in interstate commerce, met the statute's requirements including the requirement that there be a public need for 
line
 14.

Lakehead contends that the Commission's review is limited in interstate pipeline cases because it may not regulate the interstate markets involving transportation by common carriers.  Lakehead argues that the Commission only has "prudential control" over certification applications, which does not include the right to determine whether there is a need for 
line
 14.

Section 
15-401(b) lists the necessary requirements for a pipeline to be issued a license to operate as a common carrier by pipeline in Illinois.  In relevant part it provides:  

"(b) Requirements for issuance.  The Commission, after a hearing, shall grant an application for a certificate authorizing operations as a common carrier by pipeline, in whole or in part, to the extent that it finds that the application was properly filed; a public need for the service exists; the applicant is fit, willing, and able to provide the service in compliance with this Act, Commission regulations, and orders; and the public convenience and necessity requires issuance of the certificate." 220 ILCS 5/15-401(b) (West 1996).

Once certified under section 
15-401, a pipeline carrier may then pursue eminent domain authority which is authorized by section 
8-509 of the Pipeline Law, (220 ILCS 5/8-509  (West 1996)). 220 ILCS 5/15-101 (West 1996).

The plain language of section 
15-401(b) directs the Commission to determine if a public need exists, and whether the public convenience and necessity requires the proposed service, when considering every application submitted.  Lakehead insists, however, that such a directive causes the Commission to exceed its lawful authority in interstate commerce cases and places an undue burden upon such commerce.  Lakehead relies principally upon our
 
supreme court's
 decision in 
Service Pipe Line Co. v. Ruder
, 19 Ill. 2d 332, 167 N.E.2d 419 (1960).  

The 
Ruder
 Decision

Ruder
 concerned an interstate pipeline that brought a condemnation action without first applying to the Commission for approval.  The circuit court dismissed the action and on direct appeal the court affirmed, holding that an application to the Commission was a condition precedent to the exercise of condemnation power.  In reaching its decision, the court disagreed with the pipeline's argument that it had broad authority to exercise a 
state's power of eminent domain without government supervision.  The court concluded that federal legislation had not completely preempted the 
state's authority to regulate in the area, and that a 
state
 could exercise "prudential control" over an interstate utility's activities which will involve the power of eminent domain. 
Ruder
, 19 Ill. 2d at 335, 167 N.E.2d at 421.  In concluding, the court noted that it could not rule on the scope of the Commission's authority and stated that there was no need to do so absent the Commission's exercise of authority beyond that which it is conceded to have. 
Ruder
, 19 Ill. 2d at 337, 167 N.E.2d at 422.  Over 37 years later, the question concerning the Commission's authority is now before this court.  In interstate pipeline cases where the only interest in certification is the acquisition of condemnation authority, does the Commission exceed its lawful authority by enforcing the statutory prerequisites of the Pipeline Law?

Our 
state has a "firm policy of limiting its regulatory jurisdiction over interstate commerce within constitutional bounds***." 
Ruder
, 19 Ill. 2d at 335, 167 N.E.2d at 422.  The question of the necessity of eminent domain, however, remains, within constitutional parameters, a legislative function. 
St. Louis Connecting R.R. Co. v. Blumberg
, 325 Ill. 387, 156 N.E. 298 (1927).  Unless preempted by the 
federal
 government, 
state law governs certification, which is a necessary first step in acquiring eminent domain power. See 
Iowa RCO Ass'n v. Illinois Commerce Comm'n
, 86 Ill. App. 3d 1116, 409 N.E.2d 77 (1980).  Thus, to the extent that it does not conflict with 
federal
 law, section 
15-401(b) and the Pipeline Law must be applied.

Lakehead argues that this interpretation permits the Commission to proceed beyond the prudential control noted in 
Ruder
.  We disagree.  Section 
15-401 does not put the Commission in a situation in which it exercises more than prudential control.  The Commission remains solely in charge of supervising and protecting the public's general welfare with respect to public utilities. See 220 ILCS 5/4-101 (West 1996).  Through section 
15-401, it must determine whether this 
state deems the project worthy of certification so as to potentially permit condemnation authority.  It does not determine whether the pipeline should enter the market.  In fact, the Commission concedes that Lakehead is free to build a pipeline under a federal scheme just as it built 
line 6A, without first acquiring certification. But in so doing, Lakehead will have no condemnation authority.

Interstate Commerce

Lakehead and 
amici
 maintain, however, that the requirement to  demonstrate public need for a service impermissibly burdens and discriminates against interstate commerce.  

The
 
commerce clause
 of the United States Constitution grants Congress the power "to regulate commerce *** among the several states." U.S. Const., art I, § 8 clause 3.  While this language gives it very broad powers to regulate matters involving interstate commerce to the exclusion of the states, (
Retail Clerks International Ass'n v. Schermerhorn
, 375 U.S. 96,
 
11 L.Ed.2d 179, 84 S.Ct. 219 (1963)), it does not remove a
 
state's
 power to regulate issues of local import when Congress does not exercise its authority (
California v. Thompson
, 313 U.S. 109,
 
85 L.Ed. 1219, 61 S.Ct. 930 (1941)).  When Congress does not act to preempt local legislation, states and local governing bodies retain the authority to regulate matters within the general police powers even though interstate commerce is affected. 
Lewis v. BT Investment Managers, Inc.
, 447 U.S. 27,
 
64 L.Ed.2d 702, 100 S.Ct. 2009 (1980)
; 
Edward R. Bacon Grain Co. v. City of Chicago
, 325 Ill. App. 245, 59 N.E.2d 689 (1945).  But, such regulation may not conflict with free trade among the states, (
Bibb v. Navajo Freight Lines, Inc.
, 359 U.S. 520, 
3 L.Ed.2d 1003, 79 S.Ct. 962 (1959)), and may not isolate a state in a veil of economic protectionism (
Wyoming v. Oklahoma
, 502 U.S. 437, 454, 
117 L.Ed.2d 1, 22, 112 S.Ct. 789, 800
 (1992); 
Baldwin v. G.A.F. Seelig, Inc.
, 294 U.S. 511, 
79 L.Ed. 1032, 55 S.Ct. 497 (1935)).

In a case in which a statute's effect on interstate commerce is incidental, the Supreme Court describes the relevant considerations to determine a statute's validity as follows:

"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation].  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." 
Pike v. Bruce Church, Inc.
, 397 U.S. 137, 142,
 
25 L.Ed.2d 174, 178, 90 S.Ct. 844, 847
 
(1970).

The public need aspect of the statute serves to protect and restrict the exercise of such powers as eminent domain.  This is a legitimate purpose as it regulates the traditional state power of eminent domain by ensuring freedom from unnecessary and nonorderly intrusions upon private property.  When weighing the
 
state's
 interest in controlling condemnation authority against Lakehead's desire to 
supply
 
transport 
greater amounts of 
fuel
 
crude oil 
by potentially employing the State's authority, we believe the burden, if any exists, is not excessive.  Indeed, the statute does not appear to place any burden on interstate commerce since it is not restricting any federal scheme or interstate traffic.  In terms of the effect on an interstate pipeline, it merely works to regulate the use of a
 
state's
 sovereign power. See 
Missouri-Kansas-Texas R.R. Co. v. State
, 712 P.2d 40 (Sup. Ct. Okl. 1985) (state statute regulating right to exercise eminent domain authority complemented effectuation of pipeline and did not conflict with Interstate Commerce Act)
.  However, the
 
state
 is not required to provide condemnation powers and, absent Federal legislation, may decide in its discretion whether such authority is proper. See 
Blumberg
, 325 Ill. at 394, 156 N.E. at 301.  Without proof that the statutory prerequisites of the Pipeline Law have been met, certification and condemnation authority will not follow.

Lakehead also argues that section 
15-401(b), as interpreted by the Commission, discriminates against interstate commerce.  Lakehead contends that the Commission erred by requiring Lakehead to demonstrate a local public need. 

While we agree with Lakehead that requiring proof of a local public need would conflict with the 
commerce clause, (see 
Kern River Gas Transmission Co. v. Clark County, Nevada
, 757 F. Supp. 1110 (D. Nev. 1990)), we do not agree that the Commission required such a demonstration.  A local public need was one method of proving need as contemplated by the statute, but the Commission did not rule out interstate necessity.  Accordingly, we find no constitutional infringement, nor do we find that the Commission exceeded its legal authority when reviewing Lakehead's application.  
Its enforcement of the Pipeline Law does not cause it to improperly intrude into the realm of interstate commercial regulation.

B. Commission Interpretation of Section 15-401(b)

Lakehead and 
amici
 also insist that the Commission erred when it interpreted section 
15-401(b), creating an onerous burden for its application which lead to an arbitrary denial.  They assert that the Commission adopted a definition for "public need" which was unsupported by authority and was an abandonment of its prior decisions. 

The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. 
Bruso v. Alexian Brothers Hospital
, 178 Ill. 2d 445, 451, 687 N.E.2d 1014, 1016 (1997).  In determining the legislature's intent, the court considers the plain and ordinary meaning of the statute's language in the overall context of its reason and necessity and its stated purpose. 
Illinois Bell Telephone Co. v. Illinois Commerce Comm'n
, 282 Ill. App. 3d 672, 676, 669 N.E.2d 628, 630-31 (1996).  When the legislature amends a statute, it is presumed that it intended a change in the law. 
In re Petition of the Board of Trustees of the Mokena Public Library District
, 287 Ill. App. 3d 1064, 680 N.E.2d 743 (1997); 
People v. Krause
, 273 Ill. App. 3d 59, 651 N.E.2d 744 (1995).  The interpretation of a statute by an agency charged with its administration is accorded great deference and will only be reversed if erroneous. 
Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n
, 
293 Ill. App. 3d 
459, 687 N.E.2d 1144 (1997).  Given the broad delegation of authority to the Commission, this court must rely on the Commission's interpretation of the statute if there is a reasonable debate as to its meaning. 
Peoples Gas, Light & Coke Co. v. Illinois Commerce Comm'n
, 175 Ill. App. 3d 39, 52, 529 N.E.2d 671, 680 (1988).    

Prior to 1986, certification statutes like the statute involved here required a demonstration of "public convenience and necessity" before a project could proceed.  Numerous cases centered upon the interpretation of "necessity" which was squarely addressed in 
Wabash, C. & W. Ry. Co. v. Commerce Comm'n ex rel. Jefferson Southwestern R. Co.
, 309 Ill. 412, 141 N.E. 212 (1923).  There the court stated that if a matter "is of sufficient importance to warrant the expense of making it, it is a public necessity." 
Wabash, C. & W. Ry. Co.
, 309 Ill. at 418, 141 N.E. 214.  The court pointed out, however, that the word necessity cannot be strictly defined as there are different degrees of necessity.  It is a relative rather than an absolute term.  With respect to public utilities and necessity, the court held that the Commission had a right to look to current and expected conditions when investigating whether there is a public necessity for a project. 
Wabash, C. & W. Ry. Co.
, 309 Ill. at 418-19, 141 N.E. at 215.     

   In 1986 the legislature passed the Illinois Commercial Transportation Law 
(Transportation Law), (Ill. Rev. Stat. 1987, ch. 95 ½, par. 18c-1101 
et
 
seq.
), which included specific requirements to license pipeline carriers.  Previously, pipelines requiring eminent domain authority applied for certificates of public convenience and necessity under repealed section 55 of the Illinois Public Utilities Act 
(Public Utilities Act), (Ill. Rev. Stat. 1977, ch. 111⅔, par. 56).  Unlike section 55, however, the
 
Transportation Law
 required not only a demonstration of "public convenience and necessity," but also "a public need for the service." Ill. Rev. Stat. 1989, ch. 95½, par. 18c-8201.
  In 1996, the legislature transferred the source of the Commission's regulatory authority from the 
Transportation Law to
 Article XV of the 
Public Utilities Act, (220 ILCS 5/15-100 
et
 
seq.
 (West 1996)).  Shortly thereafter, the legislature amended section 
15-401 by adding a list of criteria for the Commission to consider when determining whether certification is required by public convenience and necessity. See 220 ILCS 
5/15-401(b) (West 1996).  The legislature has not defined "public need" and has not set forth criteria to consider when determining whether there is a public need for a particular service.

Because of the changes in 1986 and 1996, we must presume that the legislature intended to change the law with respect to certifying pipelines.  In this instance it appears to have elevated the requirements for certification, and its failure to provide a statutory definition of public need at any time strongly suggests that it intended to allow the Commission to exercise a flexible approach toward these matters. 
Cf.
 
Freight Forwarders Institute v. United States
, 409 F. Supp. 693 (N.D. Ill. 1976); see also 
Ranquist v. Stackler
, 55 Ill. App. 3d 545, 370 N.E.2d 1198 (1977) (importance of agency interpretations and use of agency in certain matters recognizes the existence of complex situations that require varying solutions and expertise unavailable in statutes). 

Nevertheless, Lakehead and 
amici
 insist that the Commission's interpretation is erroneous as it fails to take into account the proper considerations when determining if there is a public need for 
line
 14.

For direction in determining what group should be considered when investigating public need, the Commission turned to the Supreme Court's decision in 
Roy v. Illinois Commerce Comm'n
, 322 Ill. 452, 153 N.E. 648 (1926).  In the context of discussing public necessity and convenience, the 
Roy
 court stated that the "convenience and necessity required to support an order of the commission is that of the public and not any individuals or number of individuals." 
Roy
, 322 Ill. at 458, 153 N.E. at 648.  The Commission adopted this same approach in this case, determining that the public is larger than a limited number of market players and the need of a few refiners does not in and of itself establish a public need.  A public need, in the Commission's opinion, cannot be defined as involving only a limited number of private interests.

We can find no fault with this reasoning which takes into account the public as a whole.  Lakehead argues that the Commission's interpretation is erroneous because it excludes business and industrial interests.  It argues that businesses are part of the public and thus demonstrate "a public need" when industrial concerns require added service.  Lakehead seeks support from 
Iowa RCO Ass'n v. Illinois Commerce Comm'n
, 86 Ill. App. 3d 1116, 409 N.E.2d 77 (1980).  
Iowa RCO Ass'n
 is of little assistance, however, because there the court was faced with the question of whether a pipeline qualified as a public utility because it was demonstrated to be for public use within the meaning of what is now section 3-105 of the 
Public Utilities Act, (220 ILCS 5/3-105 (West 1996)), which defines which corporations are public utilities.  The pipeline delivered oil to several companies with which it was affiliated.  However, several nonaffiliated refineries wished to use the line and the pipeline agreed to furnish the requested service.  The Commission and the court thus determined that there was a sufficient showing of a public use. 
Iowa RCO Ass'n
, 86 Ill. App. 3d at 1118, 409 N.E.2d at 80.  

This demonstration is of no value here where public need is at issue rather than use.  In the context of public need, it is appropriate to look at the larger group of the general public to see if it requires the service, not whether some components of the public are in fact using the service.  Only by looking to the public at large can one determine whether there is an actual existing or expected popular need for the proposed service which should not be denied.  This broader understanding of public has been consistently employed by our courts. 
Thompson v. Illinois Commerce Comm'n
, 1 Ill. 2d 350, 115 N.E.2d 622 (1953); 
Illinois Highway Transportation Co. v. Illinois Commerce Comm'n
, 404 Ill. 610, 90 N.E.2d 86 (1950); 
Illinois Central R.R. Co. v. Illinois Commerce Comm'n
, 395 Ill. 303, 70 N.E.2d 64 (1946); 
Chicago Rys. Co. v. Commerce Comm'n
, 336 Ill. 51, 167 N.E. 840 (1929); 
West Suburban Transportation Co. v. Chicago and West Towns Ry. Co.
, 309 Ill. 87, 140 N.E. 56 (1923).

Lakehead also argues that the Commission erred in construing "need."  It argues that the Commission's decision essentially results in a requirement that there be an absolute necessity for a service or a demonstration that a facility is indispensably requisite. 

The Commission's order describes its approach as one which searches for a present need by looking for evidence of a current public desire, or a determination as to whether a line is necessary to meet foreseeable future demand.  It does not require a demonstration of absolute necessity.  Therefore, we reject this argument and conclude that the Commission's interpretation was reasonable.    

Additionally, Lakehead contests the Commission's approach as being an arbitrary departure from the Commission's previous decisions.  

Reviewing courts give Commission decisions great deference because they are "judgment[s] of a tribunal appointed by law and informed by experience." 
United Cities Gas Co. v. Illinois Commerce Comm'n
, 163 Ill. 2d 1, 12, 643 N.E.2d 719, 725 (1994); 
Village of Apple River v. Illinois Commerce Comm'n
, 18 Ill. 2d 518, 523, 165 N.E.2d 329, 332 (1960); 
Archer-Daniels-Midland
, 
293 Ill. App. 3d at 
463, 687 N.E.2d at 1147.  However, the Commission is not a judicial body and its orders do not have the effect of 
res
 
judicata
; the Commission, as a regulatory body must have the authority to address each matter before it freely, even if it involves issues identical to a previous case. 
Mississippi River Fuel Corp. v. Illinois Commerce Comm'n
, 1 Ill. 2d 509, 116 N.E.2d 394 (1953).  But, if the Commission drastically departs from past practices, its decisions are entitled to less deference. 
Citizens Utility Board v. Illinois Commerce Comm'n
, 166 Ill. 2d 111, 651 N.E.2d 1089 (1995); 
Business and Professional People For the Public Interest v. Illinois Commerce Comm'n
, 136 Ill. 2d 192, 555 N.E.2d 693 (1989).          

The approach taken in this docket was not a novel one.  In 1988 in 
Illini Carrier
, Ill. 
Com. Comm'n 87-0421 (Oct. 28, 1988), the Commission determined whether a need for a particular service existed by examining the abilities of other carriers in a specific region.  
Illini Carrier
 was specifically discussed and followed in this case.  Furthermore, in 1994 in 
Illini Carrier
, Ill.
 
Com. Comm'n P91-0001 (July 27, 1994), the Commission rejected essentially the same public need argument presented here.  Although that case was reversed on appeal on other grounds, (
Illini Carrier, L.P. v. Illinois Commerce Comm'n
, 288 Ill. App. 3d 835, 681 N.E.2d 1022 (1997)), it stands as evidence that the Commission has not acted arbitrarily.  Most recently in 
Quantum Pipeline Co.
, Ill. 
Com. Comm'n
 96-0001, 96-0318 (Dec. 17, 1997), the Commission, as in this case, determined whether there was a public need based upon an examination of the needs of the general public, not the needs of a few individuals.  Furthermore, the need of the general public was a common thread in other decisions. See 
Mid-America Pipeline Co.
, Ill. 
Com. Comm'n
 T88-0065 (March 22, 1989) (pipeline would assist in alleviating nationwide shortage of antifreeze); 
Mid-American Pipeline Co.
, Ill. 
Com. Comm'n
 86-0101 (Sept. 17, 1986) (pipeline would prevent plant closing).  Accordingly, we find no arbitrary departure and we hold that the Commission's interpretation is reasonable.

C. Substantial Evidence and Adequate Findings

Lakehead further posits that the Commission's decision was not supported by substantial evidence.

On appeal, the Commission's findings are accepted as 
prima
 
facie
 true. 220 ILCS 5/10-201(d) (West 1996); 
People ex rel. Hartigan v. Illinois Commerce Comm'n
, 148 Ill. 2d 348, 592 N.E.2d 1066 (1992).  This court will reverse the Commission's decision if the appellant demonstrates that the findings are not supported by substantial evidence based upon a review of the entire record. 220 ILCS 5/10-201(e)(iv)(A) (West 1996); 
Continental Mobile Telephone Co. v. Illinois Commerce Comm'n
, 269 Ill. App. 3d 161, 645 N.E.2d 516 (1994).  The appellant must show that the opposite conclusion is clearly evident. 
Illinois Bell
, 282 Ill. App. 3d at 679, 669 N.E.2d at 632.   

Refinery representatives said that their foreseeable needs could be met through other available sources.  CAP evidence demonstrated that the current supply of crude substantially exceeded the capacity of 
Midwest refineries.  Additionally, professor Miller testified that crude delivered via Line 14 would have no impact on market prices because the aggregate supply would not change.  In his opinion, the benefits would flow entirely to Lakehead and its producers.  In sum, no positive price effect could be demonstrated. This evidence supports the conclusion that Lakehead failed to demonstrate a public need for 
line 14 as opposed to a private need or desire.  Therefore, we hold that the Commission's decision was supported by substantial evidence in the record.

Lakehead also argues that the Commission's decision fails to provide adequate findings.

The Commission is not required to provide findings on each evidentiary claim; its findings are sufficient if they are specific enough to enable the court to make an informed and intelligent review of its order. 220 ILCS 5/10-201(e)(iii) (West 1996); 
City of Chicago v. Illinois Commerce Comm'n
, 281 Ill. App. 3d 617, 666 N.E.2d 1212 (1996).  In other words, it must state the facts essential to its ruling so that the court can properly review the basis for the decision. 
Business and Professional People for Public Interest v. Illinois Commerce Comm'n
, 279 Ill. App. 3d 824, 665 N.E.2d 553 (1996).  

The Commission thoroughly discussed its reasoning and supported its decision by citations to the record.  With respect to public need, it summarized the arguments and evidence with particularity and clearly addressed its method of approach.  After carefully reviewing the order, we conclude that the Commission has provided sufficient findings and analysis in order for this court to perform an informed judicial review.

III. CONCLUSION

Finally, we note that the Canadian Association of  Petroleum Producers argues that the Commission's decision contravenes the 1994 North American Free Trade Agreement (NAFTA).  However, the NAFTA argument was not specifically raised in Lakehead's application for rehearing and is therefore waived. 220 ILCS 5/10-113 (West 1996); 
Centerville Township v. Illinois Commerce Comm'n
, 5 Ill. 2d 72, 124 N.E.2d 882 (1955); 
Governor's Office of Consumer Services v. Illinois Commerce Comm'n
, 242 Ill. App. 3d 172, 607 N.E.2d 1322 (1992). 

For the foregoing reasons, the decision of the Illinois Commerce Commission is affirmed.

Affirmed.   
 
           

SLATER, J., concurs.

Justice Holdridge specially concurring:

After considering the Lakehead's petition for rehearing, I believe I must write separately to address what appears to be its fundamental argument in its petition for rehearing.  Lakehead maintains that this court has fundamentally misconstrued our supreme court's definition of "prudential control" in 
Service Pipeline Co. v. Ruder
, 19 Ill. 2d 322 (1960), which Lakehead argues clearly prohibits the Commission from denying eminent domain power to interstate carriers based upon the Commission's assessment of public need, if that assessment considers any factors other than a need for the service by an entity other than the one proposing to construct or condemn.  

  Lakehead maintains that under 
Ruder
 the Commission has no authority to treat interstate common carriers by pipeline as if they are traditional Illinois utilities and has no power to evaluate overall conditions in interstate transportation markets when assessing public need for a proposed pipeline.  Lakehead also maintains that 
Ruder
 is "clear" in holding that the Commission cannot deny eminent domain certification to an 
interstate
 carrier engaged in interstate commerce nor assess whether public convenience or need require the proposed additional service.  To do so, Lakehead maintains under 
Ruder
, would amount to an impermissible state interference in interstate commerce

If the 
Ruder
 decision in fact held as Lakehead maintains, I would be convinced that its position in the instant matter is correct.  If we had misread or misapprehended 
Ruder
, I would accept Lakehead's admonition, and grant its petition for rehearing.  As it is, I have searched the 
Ruder
 decision high and low, and simply cannot find the holdings that Lakehead believes are clear in that decision.  
Ruder
 did not place any limits upon the Commission's methodology or authority to consider an interstate pipeline carrier's application for the use of the state's power of eminent domain.  In fact, as the majority points out, the 
Ruder
 court recognized that the very issues that Lakehead brings before this court would someday be ripe for decision.  The 
Ruder
 court observed only 
that a constitutional conflict may "lurk behind" the Commission's exercise of prudential control over interstate utility projects for which the power of eminent domain is to be employed.  
Ruder
, 19 Ill. 2d at 333-34. 

As I believe that 
Ruder
 does not support Lakehead's contentions in its petition for rehearing, I concur in the decision as modified upon denial of the petition for rehearing.